**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PROTECTIVE INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 13-00297-KD-M** |
| | ) | |
| **PHILLIP PLASSE,** | ) | |
| | ) | |
| **Defendant.**[1] | ) | |

**ORDER**

This matter is before the Court on Plaintiff Protective Insurance Company's (Protective) Motion for Summary Judgment (Docs. 25), Defendant Phillip Plasse's Response (Plasse) (Doc. 30), and Protective's Reply (Doc. 36); Plasse's Motion for Summary Judgment (Docs. 24, 26) and Protective's Response (Doc. 28, 29); Protective's Motion to Strike (Doc. 31) and Plasse's Response (Doc. 34); and Plasse's Motion to Strike (Doc. 33) and Protective's Response (Doc. 35). Upon consideration and for the reasons set forth herein, Protective's motion for summary judgment is GRANTED and Plasse's motion is DENIED.

I.   **Procedural background**

In this declaratory judgment action, Protective seeks a determination as to the rights, remedies, obligations and liabilities between it and Plasse under the commercial automobile liability insurance policy issued from Protective to its insured Carroll Fulmer Logistics Corporation (Carroll). (Doc. 1) Plasse filed a counterclaim against Protective for breach of

---

[1] Plasse's company P&R Transport is not a party to this case and thus, there are no counterclaims by P&R transport against Protective, and no claims by Protective against P&R.

contract, bad faithand claiming uninsured/underinsured motorist (UM) benefits, medical benefits, and personal injury protection (PIP) benefits. (Doc. 4)[2]

This action arises from an underlying state court action pending in the Circuit Court of Monroe County, Alabama. Plasse was injured in a motor vehicle accident while driving his tractor that was leased to Carroll and pulling one of Carroll's trailers. In that action, Plasse brings two claims: Count One for ' Workers' Compensation/Occupational Accident Benefits/Employer Liability" and Count Two for "Negligence and/or Wanton Conduct". (Doc. 26-14)

## II.    <u>Findings of Fact</u>[3]

### A.   The Independent Contractor Agreement

On March 31, 2011, Carroll, Protective's insured, and Plasse a resident of Florida doing business as P&R Transport,[4] a name registered by Plasse in Florida, entered into an Independent Contractor Agreement. (Doc. 1-3) According to its terms, Plasse would provide Carroll with "transportation related services" and "Equipment"; specifically, the 2001 International tractor

---

[2]  Plasse attempted to add Carroll (and others) as a counter-defendant and assert a claim for negligent/wanton procurement of insurance and UM coverage against it. However, the Court disallowed any attempt by Plasse to add parties other than Protective (doc. 17) and thus, any and all claims against any other entities were disallowed – this includes his company P&R Transport. Additionally, Protective asserts in its summary judgment motion that Plasse asserted a failure to procure claim against Protective (doc. 25-1 at 2); he did not, the claim was asserted only against non-party Carroll Fulmer.

[3]  At the summary judgment stage, the facts are taken in the light most favorable to the non-movant. <u>Tipton v. Bergrohr GMBH–Siegen</u>, 965 F.2d 994, 998-999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

[4]  Plasse registered fictitious name P&R Transport, located in Florida, with the Florida Department of State. P&R Transport is not a corporation but is just a fictitious name for Plasse. (Doc. 26-10; Doc. 26-3 at 2; Doc. 26-4 at 17 (Dep. Plasse at 43); Doc. 26-5 at 6 (Dep. Plasse at 67)).

owned by Plasse. (Id., at 2) Carroll and Plasse specifically agreed that Plasse was an independent

contractor and not an employee of Carroll. (Id., at 6, ¶7) The parties selected the laws of the state

of Wisconsin to govern the Agreement. (Id.. at 7) Carroll registered the tractor in Wisconsin.

(Doc. 26-5 at 20 (Dep. Plasse at 225); Doc. 26-18 (Wisconsin Apportioned Registration Cab

Card).

The Agreement was to remain in effect for not less than 30 days from the date of the

Agreement, March 31, 2011, but was then subject to termination by either party. (Id., at 2)    As

to insurance, the parties agreed as follows:

> (e) <u>Insurance (49 CFR 376.12(j))</u>. The responsibilities and obligations between
> CARRIER and INDEPENDENT CONTRACTOR involving insurance shall be as
> specified in paragraph 6(d) and in Appendix B.    CARRIER shall have no
> insurance responsibilities or obligations pertaining to INDEPENDENT
> CONTRACTOR other than those expressly stated in this Agreement or mandated
> by law.

(Doc. 1-3, at 4) (capitalization in original).

Paragraph 6 addresses Carroll's responsibilities as the Carrier, and subparagraph (d)

states as follows:

> (d) <u>Insurance</u>. Unless authorized to be self-insured, CARRIER shall maintain
> public liability, property damages, and cargo insurance in such amounts as are
> required by the Federal Highway Administration, Department of Transportation,
> and applicable state regulatory agencies. CARRIER shall maintain insurance
> coverage for the protection of the public pursuant to the Federal Highway
> Administration's regulations under 49 U.S.C. § 13906. CARRIER'S
> self-insurance or possession of legally required insurance in no way restricts
> CARRIER'S right of indemnification from INDEPENDENT CONTRACTOR
> under Paragraph 5(g) and other provisions of this Agreement.

(Doc. 1-3, at 5) (capitalization in original).

Appendix B, to the Agreement contains the following:

INDEPENDENT CONTRACTOR shall be covered under CARRIER'S public liability, property damage and, with regard to common carrier service, cargo loss or damage insurance coverage and shall be charged back for CARRIER'S expense in obtaining and administering such coverage. It shall be INDEPENDENT CONTRACTOR'S responsibility to provide, at its sole cost and expense, public liability and property damage insurance to protect INDEPENDENT CONTRACTOR whenever the Equipment is not being operated on behalf of CARRIER. Such insurance shall be provided by and purchased from an insurance company acceptable to CARRIER, and shall name CARRIER as an additional insured thereunder. The insurance provided by CARRIER is not intended to protect INDEPENDENT CONTRACTOR whenever the Equipment is not being operated on behalf of CARRIER.

. . . It is INDEPENDENT CONTRACTOR'S obligation to carry any fire, theft, uninsured motorist and collision insurance that INDEPENDENT CONTRACTOR may desire, and upon CARRIER'S request, such insurance shall also name CARRIER as insured thereunder. INDEPENDENT CONTRACTOR, together with driver, does hereby (1) acknowledge that the CARRIER provides no uninsured motorist, underinsured motorist, collision insurance or worker's compensation insurance coverage; (2) waive any claim against CARRIER for entitlement to benefits under such insurance coverage; and (3) release CARRIER from any obligation to provide such coverage.

(Doc. 1-3, at 8, Appendix B) (capitalization in original).

**B. Carroll's insurance policy with Progressive**

On October 1, 2010, Protective issued Policy XA1799/XP1253.(Doc. 1-1, at 2, 4, 22) The Policy was delivered to Carroll in Groveland, Florida. Carroll was identified as the sole "named insured." (Id., at 4, Declarations) Policy XA1799 covered Personal Injury Liability (Coverage A), Property Damage Liability (Coverage B) and Employers Liability (Coverage I).[5] The Policy was in effect at the time of the accident at issue, May 2, 2011.

_____

[5] The Policy did not include Coverage E for Cargo Legal Liability, Coverage F for Physical Damage-Comprehensive, Coverage G for Physical Damage-Collision and Coverage H for Workers' Compensation/Occupational Disease. (Doc. 1-1, at 4, Declarations)

Policy XA1799 defines the "Insured", in relevant part, as follows:

M. **"Insured":** Each of the following is an **Insured** to the extent set forth below:

(1) The **"named insured"** as designated in the Declarations;

(2) The **"related insured(s)",** which shall include, if listed in the endorsements, the parent company or other company owning a controlling interest in the **named insured** and any subsidiary company of or company otherwise controlled by the **named insured's** ownership. . . . All other **related insureds**, if listed in the endorsements, shall be indemnified for their **trucking operations** as if a **named insured** under this contract;

Only for their **trucking operations, related insured(s)** shall also include:

any subsidiary or owned or controlled company of the **named insured** or **related insured** created or acquired subsequent to the inception date of this contract, . . .

(5) The **"additional insured(s)"** as designated in the endorsements and/or certificates issued by the Company. The **additional insured(s)** shall be indemnified under this contract only to the extent that the **named insured** or **related insured** is obligated by a **covered contract** to reimburse, hold harmless or indemnify the **additional insured(s).**

(Doc. 1-1, at 11, Definitions) (emphasis in original).

In relevant part, the Policy defines a "covered contract" as

(7) That part of any other contract or agreement pertaining to the **insured's trucking operations** under which any **insured** assumes the tort liability of another to pay **damages** because of **personal injury** or **property damage** to a third person or organization, if the contract or agreement is made prior to the **personal injury** or **property damage.**. . .

(Doc. 1-1, at 10) (emphasis in original).

The Policy defines a "covered vehicle" as a "land motor vehicle, trailer or semi-trailer, designed for use on public roads, including its equipment and other equipment permanently attached thereto, which is either: (1) owned by the insured, or (2) not owned by the insured while in his possession under a written agreement wherein he assumes liability for loss or damage thereto while in his possession." (Doc. 1-1, at 11) Plasse's leased tractor would have been listed on a reporting form delivered to Protective from Carroll. (Doc. 26-24, at 30, Depo. Mark Darling, Corporate Representative). Under the terms of the Independent Contractor Agreement, Plasse and the leased tractor would be covered for liability when pulling a Carroll trailer and under dispatch. (Doc. 26-24, at 14)[6]

Uninsured and Underinsured Motorists (UM)[7](Coverage C) and Personal Injury Protection (PIP) (Coverage D), are provided to Carroll pursuant to Endorsement 3 to Policy XA1799. (Doc. 1-1, at 4 "Declarations) The Endorsement names Carroll as the "Named Insured" and states in relevant partas follows:

> All coverage to be provided for Coverage (C) **Uninsured or Underinsured Motorists** and/or Coverage (D) **Personal Injury Protection** under this contract shall be provided by the form of Policy Number XP 1253 issued by the Company. Policy Number XP 1253 and all endorsements thereto now or hereafter issued are and shall be an endorsement to this contract but only as respects for Coverage (C) **Uninsured or Underinsured Motorists** and/or Coverage (D) **Personal Injury Protection.**

---

[6] "INDEPENDENT CONTRACTOR shall be covered under CARRIER'S public liability, property damage and, with regard to common carrier service, cargo loss or damage insurance coverage and shall be charged back for CARRIER'S expense in obtaining and administering such coverage." (Do. 1-3, at 8, Appendix B)

[7] As to UM/UIM coverage, Policy XA1799 defines "uninsured and underinsured motorists" as "liability for bodily injury or property damage caused by an uninsured or underinsured motorist as required by law, unless rejected, and as defined and specified in the endorsement" (Doc. 1-1, at 14).

All elections of coverage or rejections of coverage under or to Policy Number
XP1253, shall be elections and/or rejection of and to this contract.

(Doc. 1-1, p. 22, Endorsement 3) (emphasis in original; bracketed text added).

The Declaration for Policy XP1253 indicates that Carroll is the only "Named Insured,"
(Doc. 1-1, at 29) Item four of the Declarations for UM and PIP coverage in Policy XP1253,
identifies the "Limit" of coverage for UM: "The most we will pay for any one 'accident' or
'loss' . . . under UNINSURED MOTORISTS and UNDERINSURED MOTORISTS is the
minimum amount required by law in the state where the covered auto is principally garaged after
all rights of rejection and selection of lower limits have been exercised by you[.]"(Doc. 1-1, at
29)  For PIP coverage, that limit "is separately stated in each P.I.P. endorsement." (Id.)

Item five defines "covered 'autos'" for UM and PIP coverage, as follows:

(a) with respect to UNINSURED MOTORISTS and UNDERINSURED
MOTORISTS

Only those "autos" you own that, because of the law in the state where they are
licensed or principally garaged, are required to have and cannot reject Uninsured
Motorists and/or Underinsured Motorists Coverage. This includes those "autos"
you acquire ownership of after the policy begins provided they are subject to the
same state uninsured and underinsured motorists requirement.

(b) with respect to PERSONAL INJURY PROTECTION (P.I.P)

Only those "autos" you own that are required to have No-Fault benefits in the
state where they are licensed or principally garaged. This includes those "autos"
you acquire ownership of after the policy begins provided they are subject to the
No-Fault law in the state where they are licensed or principally garaged.

(Doc. 1-1, at 29, Declarations)

According to Carroll's Risk Manager, Josh Fulmer, upon purchase of the policy, UM

benefits were offered but rejected by Carroll in writing in each state that allows rejection, but in the states that required a certain minimum of UM benefits, Carroll purchased only the minimum coverage required. (Doc. 28-2 at 2; Aff. Fulmer at ¶1-2)[8] Carroll's signed rejections are part of Policy XP1253, which was incorporated into Policy XA1799. (Doc. 1-1, at 22, 29, 37 (list), 40-372) Carroll executed a specific written rejection of UM coverage and medical payments coverage for Wisconsin where the tractor was licensed, rejection of UM[9] coverage for Florida where the tractor was principally garaged, and Alabama where the accident occurred. (Id. at 370-371, 282, 258)

The Independent Contractor Agreement contained an acknowledgment that Carroll was not providing UM coverage for leased tractors or their drivers. (Doc.1-3, at 8, Appendix B) Plasse did not purchase UM coverage.

Policy XA1799 defines PIP as "liability for various prescribed benefits under applicable no-fault laws as required by such laws and as specified in the endorsements" (Doc. 1-1, at 13). Policy XP1253 does not contain a PIP endorsement for Alabama or Wisconsin, but does contain an endorsement for coverage for Carroll in Florida. (Doc. 1-1, at 37, List of Forms and Endorsements)

---

[8] "This rejection was intended to cover any other entity, individual or organization which may qualify as an insured under the policy. There was no intent…to provide UM/UIM benefits to Philip Plasse or P&R Transport, and the effective rejection of these benefits is not disputed by Carroll…. Plasse was advised, and acknowledged, that no such benefits would be provided to him in his Independent Contractor Agreement, and that obtaining this coverage would be his responsibility." (Doc. 28-2, Aff. Fulmer at ¶3)

[9] The endorsement identifies only UM coverage. However, under Florida law the "term 'uninsured motor vehicle' includes an underinsured motor vehicle". State Farm Mutual Auto Ins. Co. v. Curran, 135 So. 3d 1071, 107 (Fla. 2014).

In that regard, Carroll purchased PIP protection in the amount of $10,000.00[10] from

Protective. (Doc. 1-1, at 57-67) The Florida PIP endorsement "modifies" Policy

XA1799/XP1253 "[f]or a covered 'auto' licensed or principally garaged in, or 'garage

operations' conducted in Florida." (Doc. 1-1, at 57) The definition of "covered motor vehicle"

for PIP coverage, begins with the phrase "Only those 'autos' you own ..."(Doc. 1-1, at 29,

Declarations)    Under the Florida PIP endorsement definitions, "'[o]wner' means a person or

organization who holds legal title to a 'motor vehicle'" or "[a] lessee having the right to

possession, in the event a 'motor vehicle' is the subject of a lease without option to purchase, and

such lease is for a period of six months, or more, and the lease agreement provides that the lessee

shall be responsible for securing insurance." (Doc. 1-1, at 62)[11]

The PIP endorsement defines "Insured" as the "named insured." (Doc. 1-1, at 58)

"'Named Insured' means the person or organization named in the Declarations of the policy[.]"

(Doc. 1-1, at 62)    Carroll is the only named insured. (Doc. 1-1, at 29, Declarations)

The PIP endorsement also defines "Insured" as "[a]ny other person while 'occupying' a

covered "motor vehicle' with the 'named insured's' consent." (Doc. 1-1, at 58) However, the

Florida PIP endorsement excludes coverage "[t]o any person, other than the 'named insured' if

that person is the 'owner' of a 'motor vehicle' for which security is required under the Florida

Motor Vehicle No-Fault Law." (Doc. 1-1, at 58) In addition, the "Notification of Personal Injury

---

[10]  The endorsement provides, in relevant part, for a "Total Aggregate Limit for all Personal
Injury Protection Benefits", per person, of $10,000 for personal injury and for "80% of medical
expenses subject to total aggregate limit" and "60% of work loss subject to total aggregate limit."
(Id. at 57)

[11]  Plasse asserts that another section of the PIP endorsement applies. Specifically where there is
a lease-purchase agreement. (Doc. 26, at 19) There is no evidence that Carroll and Plasse had
executed a lease-purchase agreement.

Protection Benefits from the Office of Insurance Regulation" explains that "If you are a resident of Florida and own a motor vehicle, you are required to purchase PIP." (Doc. 1-1, at 63) Plasse was a resident of Florida and owned the tractor which was principally garaged in Florida, but he did not purchase PIP coverage.

### C. The non-trucking liability insurance

Plasse purchased non-trucking, or bobtail, liability insurance for the tractor from Protective. He obtained this insurance through Carroll, which took the premium out of his pay. (Doc. 26-4 at 13 (Dep. Plasse at 35); Doc. 26-5 at 18, 21 (Dep. Plasse at 222, 229); Doc. 26-7, Operator Settlements (pay statement)). The non-trucking liability insurance covered the tractor when it was not driven for Carroll. Plasse did not purchase any UM or PIP coverage with this policy.

### D. The Certificate of Liability

On March 31, 2011, a Certificate of Liability Insurance was issued by Neace Lukens, Carroll's insurance agent. (Doc. 26-9) Plasse kept the Certificate with his other truck papers. (Doc. 26-4, at 16) The Certificate identified P&R Transport as a "Certificate Holder" and identified "Leased Driver Operators of Carroll Fulmer Logistics" as the "Insured".The Certificate states in relevant part, as follows:

> This Certificate is issued as a matter of information only and confers no rights upon the certificate holder. This Certificate does not affirmatively or negativelyamend, extend or alter the coverage afforded by the policies below.

(Doc. 26-9, at 2).

Two policies were listed in the Certificate: An automobile policy for physical damage with Policy Number 015048962 with Lexington Insurance Company and "Non Trucking Liab"

(*sic*) with Policy Number XA1799 with Protective. The latter indicated a policy limit of $1,000,000.00. The Certificate also states that Certificate Holder P&R Transport "is listed as loss payee in regard to Unit #CF9468, 2001 International . . . Owner/Operator: P&R Transport" and that the coverage terminated when the lease with Carroll terminated. (Doc. 26-9)

**E. The accident**

On May 2, 2011, Plasse was operating his tractor and pulling a trailer for Carroll. Plasse alleges that while traveling on Highway 21 in Monroe County, Alabama – "under dispatch" and hauling a load for Carroll -- he was involved in a non-contact accident with a phantom vehicle.[12] As alleged, the phantom vehicle pulled into Plasse's lane of travel and he swerved to avoid contact, jackknifing his tractor-trailer and sliding into a ditch. After the accident, Plasse filed a claim for UM benefits, medical benefits, and PIP benefits as an insured under Carroll's policy with Protective.

Since the accident, Plasse has been unable to work. He has back problems and rib pain. He had health insurance with Carroll and either Carroll or Zurich Insurance paid his medical care, workmen's compensation pay, and occupational health pay. Carroll has since stopped paying his health insurance and medical bills. Plasse does not have health insurance. (Doc. 25-2 at 6 (Dep. Plasse at 61-64)).

**III.** **Motions to Strike**

At the outset, with the December 1, 2010 rules change to Rule 56 of the Federal Rules of Civil Procedure, it appears that motions to strike submitted on summary judgment are no longer

---

[12] Carroll disputes that a phantom vehicle was involved on basis that Plasse has not presented any evidence as to how the accident occurred except for his description of the events. (Doc. 28, at 2)

appropriate. Revised Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." The Advisory Committee Notes specify as follows:

> "Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. *There is no need to make a separate motion to strike.* If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial."

Fed.R.Civ.P. 56, *Adv. Comm. Notes*, "Subdivision(c)" (2010 Amendments) (emphasis added). As such, the Court construes each party's motion as Objections.

Protective filed a motion to strike the Affidavit of Sara Simms, an employee of Neace Lukens, the insurance agency through which Carroll purchased the policy at issue, which was filed by Plasse in opposition to Protective's motion for summary judgment (doc. 31, motion to strike; doc. 26-4, Affidavit). Protective argues that the issue of the existence of bobtail or non-trucking liability coverage for Plasse is irrelevant because he was not bobtailing at the time of the accident, but instead was pulling a Carroll trailer.

Plasse responds that Florida law requires that an insurance company provide UM coverage unless it is expressly rejected by the named insured. Plasse asserts that since he was covered for bobtail insurance, he should be automatically covered for UM coverage according to Florida law; thus, the evidence is relevant.

The motion to strike is MOOT. The Court did not rely upon Simms' affidavit to reach its decision because the information contained therein was irrelevant.

Plasse filed a motion to strike the affidavit of Josh Fulmer, Risk Manager for Carroll,

filed by Protective in opposition to Plasse's motion for summary judgment (doc. 33, motion to strike; doc. 28-2; Affidavit; doc. 28-3 and doc. 29, Producer-Company Agreement). Plasse contends that the affidavit is inadmissible hearsay offered to prove that that Carroll rejected UM coverage and that Plasse was advised of and acknowledged the rejection. Plasse also argues that the exhibit has been produced untimely and should be struck on that basis.

The motion to strike is DENIED. The Court finds that the evidence can be presented in a form that would be admissible at trial, *i.e.*, live testimony of Josh Fulmer. *Jones v. UPS Ground Freight*, 683 F. 3d 1283, 1293-1294 (11th Cir. 2012) ("'a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.'")

## IV. Conclusions of Law

### A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (Dec. 2010). Rule 56(c) provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented

in a form that would be admissible in evidence.

*(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

*(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010).

The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).   If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.   Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992) (internal citations and quotations omitted).

The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment. See, e.g., Am. Bankers Ins. Group v. United States, 408 F.3d 1328, 1331 (11th Cir.2005); Gerling Global Reins. Corp. of Am. v. Gallagher, 267 F.3d 1228, 1233 (11th

Cir.2001). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir.1984) (citation omitted). The Court is mindful that "[w]hen both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." Muzzy Prods., Corp. v. Sullivan Indus., Inc., 194 F.Supp.2d 1360, 1378 (N.D. Ga. 2002). The Court has reviewed the facts submitted by each party and has made its own examination of the record.

**V.    Analysis**

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), and the insurance policy at issue has no choice of law provision. See, e.g., Frank Briscoe Co., Inc. v. Georgia Sprinkler Co., Inc., 713 F.2d 1500, 1503 (11th Cir.1983). A federal court sitting in diversity applies the laws, including principles of conflict of laws, of the state in which the federal court sits – here Alabama. Colonial Life & Acc. Ins. Co. v. Hartford Fire Ins. Co., 358 F.3d 1306, 1308 (11th Cir. 2004). Alabama applies the traditional doctrines of *lex loci contractus* to contract claims and *lex loci delicti* to tort claims. The doctrine of *lex loci contractus* governs the validity, interpretation, and construction of the contract. Cherry, Bekaert& Holland v. Brown, 582 So.2d 502, 506 (Ala.1991). The doctrine states that "a contract is governed by the laws of the state where it is made except where the parties have legally contracted with reference to the laws of another jurisdiction."Id. The doctrine of *lex loci delicti,* on the other hand, requires the court to "determine the substantive rights of an injured party according to the law of the state where the injury occurred." Fitts v. Minnesota Mining & Mfg. Co., 581 So.2d 819, 820

(Ala.1991).

Protective's declaratory judgment action sounds in contract, and Plasse's counterclaims for breach of contract and bad faith likewise sound in contract. The doctrine of *lex loci contractus* therefore, applies to these claims. The parties agree that the insurance contract was issued for delivery to non-party Carroll in Florida. Thus, Florida law governs the contractual claims in this case.

Also, despite Plasse's assertions regarding the significance of his tractor's Wisconsin registration, Wisconsin law is irrelevant to a determination of the rights and obligations set forth in the Protective insurance policy issued to Carroll in Florida. Under the facts of this case, Wisconsin law applies only to the Independent Contractor Agreement between P&R and Carroll.

Under Florida law, the "construction of an insurance policy [ ] is a question of law[.]" WashingtonNational Ins. Corp. v. Ruderman, 117 So. 3d 943, 948 (Fla. 2013). "Where the language in an insurance contract is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning so as to give effect to the policy as written." Id. (citation omitted). "[P]olicy language is considered to be ambiguous . . . if the language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage." Id. (citation omitted). Generally, any ambiguity "must be liberally construed in favor of coverage and strictly against the insurer. Id. at 949. However, "[i]f a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." Taurus Holdings, Inc. v. U.S. Fidelity and Guaranty Co., 913 So.2d 528, 532 (Fla. 2005).

**A.      UM Benefits**

Protective argues that Carroll, the named insured on Policy XA1799 and Policy XP1253, effectively rejected UM coverage in Alabama, where the accident occurred, in Florida where Plasse resides and Carroll conducts business, in Wisconsin where the tractor was registered, and in all other states where rejection was allowed. Protective states that Carroll accepted the statutory minimum amount of UM coverage in the states that require a mandatory minimum. (Docs. 25-1, 28) Protective argues that because Plasse is not a "named insured", Protective had no obligation to offer him UM coverage, and he had no statutory right to reject or accept UM coverage.

Protective also argues that the Certificate of Liability Insurance[13] does not amend Policy XA1799 or XP1253 to include Plasse as the "named insured", but instead "generally names those drivers that would qualify as omnibus insureds under the Protective Policy while in the course of trucking operations for Carroll Fulmer – owner operators." Protective argues that his status as an owner-operator covered for liability while driving for Carroll does not make Plasse a "named insured" who is required to reject UM benefits in writing. (Doc. 28, at 9-10)

Plasse argues that he is a "named insured" under Carroll's Policy XA1799 and Policy XP1253 because he is a leased driver. He also argues that he is "the named insured" under the Certificate of Liability Insurance issued by Neace Lukens because he is one of the "Leased Driver Operators of Carroll Fulmer Logistics" identified in the Certificate as an Insured. (Doc. 26, at 17, 24) Plasse refers to the "leased drivers" as an "additional named group of insureds". (Doc. 26, at 17) Plasse also argues that because neither Protective nor its agent Neace Lukens

_____

[13] Protective also argues that Plasse is claiming benefits for himself while the non-trucking liability insurance was meant to protect Plasse from claims against him by other persons. (Doc. 25-1, at 11)

offered him UM coverage or provided him a meaningful opportunity to reject UM coverage, as required by Florida statutory law, he is "entitled to UM coverage not less than the $1,000,000.00 covered by his Non-Trucking Liability." (Doc. 26, at 24)

Florida Statutes § 627.727(1) states that

No motor vehicle liability insurance policy which provides bodily injury liability coverage shall be delivered or issued for delivery in this state with respect to any specifically insured or identified motor vehicle registered or principally garaged in this state unless uninsured motor vehicle coverage is provided therein or supplemental thereto for the protection of persons injured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom. However, the coverage required under this section is not applicable when, or to the extent that, an insured named in the policy makes a written rejection of the coverage on behalf of all insureds under the policy.

Fla. Stat. § 627.727(1).

The Court finds that Policy XA1799 and Policy XP1253 unambiguously identify Carroll as the only "named insured". Thus, Carroll effectively rejected UM coverage in every state where it was allowed to do so and purchased the minimum UM coverage in the states that mandated minimum coverage by statute.

Despite the language of the Certificate of Liability Insurance, which indicates that the "Leased Driver Operators of Carroll Fulmer Logistics" are the "Insureds" under Policy XA1799, the Certificate also states as follows: "This Certificate does not affirmatively or negatively amend, extend or alter the coverage afforded by the policies below." (Doc. 26-9) The Policy listed below is Policy XA1799. The Certificate further explains that it is "issued as a matter of information." (Id.) Thus the unambiguous language of the Certificate indicates that listing the "Leased Driver Operators" as "Insureds" does not alter the fact that Carroll is the only "named

insured" under Policy XA1799 and Policy XP1253.

Plasse also argues that because he is a "named insured" or an insured leased driver under Carroll's liability Policy and a person "occupying" a "covered vehicle", the leased tractor, with Carroll's permission, he is entitled to stack the UM coverage in Policy XP1253 for the states in which Carroll could not reject UM coverage and paid a premium for the statutory minimum amount. Protective responds that Florida law governs the rights and liabilities of the parties, and not the law of the states where the mandatory coverage was required. Protective argues that UM coverage has been properly rejected under Florida law. As to Plasse's argument that "other states' laws somehow apply", Protective responds that "[t]here has been no conflict-of-laws analysis by Plasse, but it is inconceivable that Florida would apply another state's laws to a contract of insurance issued in Florida upon which Plasse, a Florida resident, bases his claim." (Doc. 35, at 3-4)[14]

Plasse has not provided the Court with any case law to support his argument that he can claim, much less stack, the UM coverage in policies in the states where Carroll purchased a mandatory minimum of UM coverage. While Florida law allows stacking, this is only applicable

---

[14] Plasse argues that Carroll's Wisconsin UM/UIM coverage should inure to his benefit because the tractor was registered there and Wisconsin statutorily mandates UM/UIM coverage. He argues that he should be covered up to policy limits. (Doc. 30, at 11-12) Plasse is not correct. Wis. Stat. § 632.32(4)(d) provides that the required uninsured motorist and medical payments coverage "does not apply to a commercial liability policy if the coverage it provides for the insured's liability arising out of the maintenance or use of a motor vehicle is limited to . . . an umbrella or excess liability policy." Wis. Stat. § 632.32(4m) provides likewise for rejection of underinsured motorist coverage. Policy XA1799 is a commercial liability policy designated as an "Excess Contract" (doc. 1-1, at. 6) that provides coverage in excess of Carroll's self-retention of $250,000.00 set forth in the declarations. (Doc. 1-1, at 5) Thus Carroll could and did reject uninsured motorist coverage, medical payments coverage. (Doc. 1-1, at 370, 371) The rejection form states that Section 632-32 permits the insured named in the policy to reject UM and UIM coverage "offered under an umbrella or excess liability policy." (Doc. 1-1, p. 370)

when there is UM coverage under Florida law. Because Florida law allows rejection of UM coverage and it was in fact rejected, there is no UM coverage on which to stack.

Additionally, any coverage afforded to Plasse under his non-trucking liability coverage as indicated on the Certificate of Liability Insurance does not apply. There is no dispute of fact that Plasse was driving his leased tractor and pulling a Carroll trailer at the time of the accident. <u>Great American Assurance Company v. Sanchuk</u>, LLC, 2012 WL 5306354 (M.D. Fla. Oct. 26, 2012) (finding that a non-trucking liability policy unambiguously excluded coverage for "Trucking or Business Use" under the liability policy and the UM endorsements because the accident occurred while the claimant was hauling cargo for a business purpose).

Accordingly, Protective is entitled to judgment as a matter of law that Plasse is not entitled to UM coverage under Policy XA1799.

### B. PIP Benefits

Plasse argues[15] that Carroll's statutorily-required Florida PIP coverage applies to him because Carroll constructively owned the tractor, the tractor was a covered auto garaged in Florida, and the Florida PIP endorsement "provides personal injury recovery for a covered auto licensed, principally garaged, or with garage operations in Florida." (Doc. 30, at 17)   He argues that he is "insured as a person occupying[16] a covered vehicle with the named insured's consent"

---

[15]  In his brief in support of his motion for summary judgment, Plasse argues that Protective "failed to include P.I.P. benefits and Florida no fault insurance in the Bobtail Liability coverage for the additional named group of insureds, lease drivers or Carroll Fulmer." (Doc. 26, at 17) However, he fails to develop this argument.

[16]  "Occupying means in or upon or entering into or alighting from." (Doc. 1-1, p. 62)

since he was hauling a load for Carroll.[17](Doc. 30, at16-20)    He also argues that he is entitled to coverage on the PIP endorsements for other states because "Endorsement No. 3, Policy Number XP1253 and all endorsements thereto" are endorsements to Carroll's Policy. (Doc. 30, at 16)

Protective argues that the tractor was registered in Wisconsin, not required to be registered in Florida, and therefore not subject to the PIP requirements of Florida law." (Doc. 36, at 3; Doc. 28, at 10-11) Protective also argues that Plasse as the owner and a resident of Florida, was required to purchase PIP benefits to the extent it was required under Florida law. (Id.)

Under Florida law, residents are required to purchase certain minimum levels of insurance, including PIP coverage. FLA. STAT. §§ 627.736(1); 627.733(1)(a).    The latter section specifies that "[e]very owner or registrant of a motor vehicle . . . required to be registered and licensed in this state shall maintain security as required in subsection 3 in effect continuously throughout the registration or licensing period." Thus, "each motor vehicle owner or registrant required to be licensed in Florida is required to carry a minimum amount of personal injury protection, or PIP insurance, for the benefit of the owner and other designees." Warren v. State Farm Mutual Auto.Ins., Co., 899 So.2d 1090, 1094 (Fla. 2005).

The Florida PIP endorsement defines "Owner" as "a person or organization who holds the legal title to a 'motor vehicle'" (Doc. 1-1, at 63)    The endorsement also defines the "Owner" as a "lessee having the right to possession, in the event a 'motor vehicle' is the subject of a lease without option to purchase, and such lease is for a period of six months or more, and the lease agreement provides that the lessee shall be responsible for securing insurance." (Doc. 1-1, p. 62) Plasse falls under the definition of "Owner" in the endorsement. The ICA bound the parties only

---

[17]    Named insured means the person or organization named in the Declarations of this policy…: (Doc. 1-1, at 62)

to a 30-day term after which either party could terminate the Agreement. Therefore, the lease of the tractor was not for a period of six months or more such that Carroll would fall under the definition of owner in the Florida PIP endorsement. The unambiguous language of Carroll's Florida PIP endorsement indicates that PIP coverage is not available to Plasse.

Accordingly, Protective is entitled to judgment as a matter of law that Plasse is not entitled to PIP coverage.

### C.    <u>Failure to procure</u>

The Court finds Plasse's argument that Carroll or Progressive breached a duty or obligation to offer UM benefits or provide him with an opportunity to reject UM benefit is without merit. The Independent Contractor Agreement unambiguously set forth that Plasse as an independent contractor was obligated to carry any UM insurance and further provided that Plasse acknowledged that Carroll did not provide UM coverage.

### D.    <u>Plasse's claims for Breach of Contract and Bad Faith</u>

Protective argues that regardless of whether Plasse has claimed a bad-faith refusal to pay or a bad-faith refusal to investigate, the tort requires a covered claim, and since there are no benefits available to Plasse under Carroll's policy, the breach of contract claim should be resolved as a matter of law in favor of Progressive. The Court agrees. Under Florida law, a prerequisite to such a claim is the existence of a contract, <u>i.e.,</u> a policy, which provides the benefits. <u>See North American Van Lines, Inc. v. Lexington Insurance Company</u>, 678 So. 2d 1325, 1332 (Fla. App. 4 Dist. 1996) ("In Florida, a bad faith claim is an action *ex contractu*."); Fla. Stat. § 627.402 (Under Florida law, an insurance policy is "a written contract of insurance . . . and includes all clauses, riders, endorsements, and papers, which are a part thereof.") Although

Plasse had purchased a policy covering non-trucking liability insurance from Protective through Carroll, he was not a named insured on Carroll's Policy with Protective as to which he seeks UM and PIP coverage. Since Plasse has failed to establish that he was a named insured in the Policy, his claims for breach of contract and bad faith fail and Protective is entitled to judgment as a matter of law as to these claims.

## VI.    Conclusion[18]

For the reasons set forth herein, Protective's motion for summary judgment is GRANTED and Plasse's motion is DENIED.

A Final Judgment consistent with the terms of this Order shall be entered by separate document as required by Rule 58 of the <u>Federal Rules of Civil Procedure</u>.

**DONE** and **ORDERED** this the 11th day of **August 2014.**

s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[18] The practice of filing motions to reconsider has become commonplace.   Considering the heightened burden that must be met for the Court to reconsider, the Court has found most such motions to be a waste of the Court's and the parties' resources.